UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALEXANDRIA N., <br><br> Plaintiff, <br><br> v. <br><br> MARTIN J. O'MALLEY, <br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | No. 21 CV 5841 <br><br> Magistrate Judge McShain |

### MEMORANDUM OPINION AND ORDER

Plaintiff Alexandria N. appeals the Commissioner of Social Security's decision denying her applications for benefits. For the following reasons, plaintiff's motion for summary judgment [17] is granted, defendant's motion for summary judgment [18] is denied, and the case is remanded for further administrative proceedings.[1]

## Background

In December 2018, plaintiff applied for a period of disability and disability insurance benefits, alleging an onset date of September 30, 2016. [14-1] 15. Plaintiff also applied for supplemental security income in May 2019, alleging the same onset date. [*Id.*]. Plaintiff's claims were denied initially, on reconsideration, and by an administrative law judge (ALJ) in March 2021. [*Id.*] 15-38. The Appeals Council denied review in August 2021, [*id.*] 1-6, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955 & 404.981. Plaintiff then appealed to this Court [1], and the Court has subject-matter jurisdiction pursuant to 42 U.S.C. § 405(g).[2]

The ALJ reviewed plaintiff's claims in accordance with the Social Security Administration's five-step sequential-evaluation process. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged onset date. [14-1] 18. At step two, the ALJ determined that plaintiff had the following severe impairments: epilepsy, rheumatoid arthritis, fibromyalgia, hidradentis

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [14], which refer to the page numbers in the bottom right corner of each page.

[2] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge. [8, 10].

suppurativa, and obesity. [*Id.*] 18-22. At step three, the ALJ ruled that plaintiff's impairments did not meet or equal the severity of a listed impairment. [*Id.*] 22-23. Before turning to step four, the ALJ determined that plaintiff had the residual functional capacity (RFC) to perform light work, provided that she could only occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never work at unprotected heights and with moving mechanical parts; could never drive; could tolerate only occasional exposure to vibration; and could perform only simple, routine tasks due to memory issues. [*Id.*] 23-36. At step four, the ALJ found that plaintiff could not perform her past relevant work. [*Id.*] 36. At step five, the ALJ concluded that jobs existed in significant numbers in the national economy that plaintiff can perform: housekeeping cleaner (135,000 jobs), inspector hand packager (10,000 jobs), and merchandise markers (97,000 jobs). [*Id.*] 37. Accordingly, the ALJ found that plaintiff was not disabled.

## Legal Standard

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019)). "When reviewing a disability decision for substantial evidence, we will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Warnell v. O'Malley*, 97 F.4th 1050, 1052-53 (7th Cir. 2024) (internal quotation marks and brackets omitted).

## Discussion

Plaintiff argues that the ALJ erred by (1) rejecting the opinion of her treating neurologist, Dr. Anna Serafini; (2) failing to determine the frequency of plaintiff's epileptic seizures and headaches and account for these symptoms in the RFC; (3) failing to justify his decision that plaintiff was capable of frequent handling and fingering; and (4) rejecting plaintiff's subjective symptom allegations. [17] 7-15. For the following reasons, the Court agrees that substantial evidence does not support the ALJ's decision to reject significant portions of Dr. Serafini's opinion, and that a remand is required.[3]

An ALJ "will not defer or give any specific weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from a [claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ will explain "how persuasive [he] find[s] all of the medical opinions and all of the prior

---

[3] Because this issue is dispositive, the Court does not address plaintiff's other grounds for remand.

2

administrative medical findings[.]" 20 C.F.R. § 404.1520c(b). In deciding how persuasive a given opinion or finding is, the ALJ considers "supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict" the opinion or finding. *Victor F. v. Kijakazi*, No. 22 C 1451, 2023 WL 2429357, at *3 (N.D. Ill. Mar. 9, 2023). "Supportability and consistency are the two most important factors." *Id.* "An ALJ's decision must explain how she considered the factors of supportability and consistency, but she is not required to explain how she evaluated the other factors." *Id.* "[A] detailed analysis is not required," but the ALJ must "give a reviewing court the bridge to connect the outcome to the record." *Id.* (internal quotation marks and brackets omitted).

Dr. Serafini, who had treated plaintiff for three years, completed a physical RFC statement in November 2020. [14-14] 2100-06. She diagnosed plaintiff with localization-related focal epilepsy with simple partial seizures, a life-long condition. [*Id.*] 2100. According to Serafini, plaintiff experienced daily headaches (during which she sees spots and experienced photophobia and phonophobia), staring spells, and seizures followed by a loss of consciousness. [*Id.*]. Dr. Serafini opined that plaintiff would need to lie down for ten minutes after a seizure and that, while plaintiff's seizures were unpredictable, plaintiff would need between 15 minutes and 1-2 days to recover, depending on the severity of a given seizure. [*Id.*] 2101. Serafini further opined that plaintiff's seizures would cause her to be off-task for 10% or less of an eight-hour workday and that plaintiff would need to take at least one unscheduled break, lasting 10 to 15 minutes, each day because of her seizures. [*Id.*] 2102, 2106. Finally, Dr. Serafini opined that plaintiff was extremely limited in her ability to sit, stand, walk, and lift. [*Id.*] 2102-03.

The ALJ found Dr. Serafini's RFC statement to be "unpersuasive." [14-1] 35. According to the ALJ, Dr. Serafini:

> alleges that the claimant needs to recline after a seizure, which are unpredictable, and recovery time could last one to two days if the event requires hospitalization. She further opines that the claimant would be off-task 20% of the workday, and require unscheduled breaks. She opines limitations consistent with less than sedentary work, including that the claimant can stand and walk less than an hour during the workday, and can lift/carry less than five pounds. She further opines that the claimant should avoid temperature extremes, fumes, and gases, although the claimant, herself, acknowledges that stress triggers symptoms, rather than pulmonary irritants or temperature extremes. Such limitations are inconsistent with this provider's own findings, as April 2019 exams of the claimant show normal gait, muscle bulk and tone, and coordination, 5/5 strength throughout the extremities, and normal sensory function and reflexes throughout. The claimant was further observed to be fully alert and oriented, and with normal

3

> cognitive function, wholly unsupportive of off-task limitations opined by Dr. Serafini. (6F/69-70).
>
> Dr. Serafini, in rendering such opinion, also refers to the claimant's December 2018 EMU evaluation, which findings also fail to support her limitations. While the claimant alleged daily migraines lasting less than an hour, and staring spells lasting five to six minutes, records note that her boyfriend, who was with her during the evaluation, denied that she had staring spells or unresponsiveness. (6F/8). Examinations during EMU admission further note that the claimant was alert and oriented, and retained normal cognitive function. Similar to Dr. Serafini's own findings, EMU exams also showed the claimant with normal gait, muscle bulk and tone, and coordination, 5/5 strength throughout the extremities, and normal sensory function and reflexes throughout, although and [*sic*] EEG presented with some abnormalities. (6F/10-11). There were some exams with EMU showing 4/5 weakness in the lower extremities, albeit inconsistent (with some indication of giveaway weakness), and improved throughout admission, nevertheless. Gait remains normal. (6F/19, 24, 28). Nevertheless, these findings do not support Dr. Serafini's extreme limitations on the claimant's ability to stand and walk, or lift and carry. The EMU merely switched the claimant's current medication Depakote, and instead, recommended Zonisamide to treat seizures and migraines. The claimant remained on the same medication at her August 2019 and January 2020 consultative exams, suggesting good control of symptoms with such treatment. (9F/2; 14F/3).

[14-1] 35-36.

Substantial evidence does not support the ALJ's finding that Dr. Serafini's opinion regarding plaintiff's off-task time, her need for unscheduled breaks, and the recovery period that could follow a seizure were unsupported.

First, the ALJ made a major factual error in discrediting the opinion about off-task time. Although Dr. Serafini opined that plaintiff's seizures would cause her to be off-task for up to 10% of the workday, the ALJ mistakenly believed that Serafini had opined that plaintiff "would be off-task 20% of the workday." [14-1] 35. Making matters worse, the ALJ then concluded that the supposed 20% "off-task limitations opined by Dr. Serafini" were "wholly unsupport[ed]" by Serafini's treatment notes. [*Id.*]. This was so, the ALJ explained, because during an April 2019 examination, plaintiff was "observed to be fully alert and oriented, and with normal cognitive function[.]" [*Id.*]. This passage demonstrates that the ALJ never considered whether Dr. Serafini's treatment notes supported the less extreme, 10% off-task limitation that actually appeared in Serafini's RFC statement. *See Israel v. Colvin*, 840 F.3d

4

432, 439 (7th Cir. 2016) (remanding where ALJ misread treaters' opinions and thus mistakenly believed that treaters had exaggerated claimant's limitations); *Esin A. v. Berryhill*, No. 18 C 1148, 2019 WL 339511, at *3-4 (N.D. Ill. Jan. 28, 2019) (where ALJ misread treater's opinion as restricting plaintiff from any hand manipulation, fingering, and gripping, court held that "[r]emand is required so that the ALJ can re-evaluate [the] opinions based on a correct reading of their contents"). In any event, Dr. Serafini opined that an off-task limitation was warranted because of plaintiff's seizures, which were unpredictable but entailed a loss of consciousness and necessitated recovery time. Yet the ALJ ignored the obvious relationship between a seizure and the off-task limitation when he found that a single treatment note documenting normal cognitive function and full alertness undermined the off-task limitation. *See* [14-1] 619. It should go without saying (but apparently needs to be said) that the fact that plaintiff remained alert and oriented during a routine neurology examination in no way implies that plaintiff could remain on-task while experiencing a seizure or staring spell.[4]

Second, the ALJ failed to build a logical bridge from the evidence of plaintiff's admission to an epilepsy monitoring unit (EMU) to his conclusion that Dr. Serafini's opinion was unsupported.

In December 2018, plaintiff participated in a five-day EMU study, during which she was placed under continuous EEG monitoring "to characterize the nature of her staring spells." [14-1] 495. During the study, plaintiff (1) had a "staring spell for few seconds, where she seemed to not answer questions and not hear what was told to her," (2) was observed by a nurse to "put her head back to the pillow then head slumped forward and she was not responding," after which her eyes "rolled back" and flutter and "she was not responding to questions," and (3) reported feeling "out of her body." [*Id.*] 499. While none of these events had an EEG correlate, the supervising neurologist concluded that "[t]his EMU study is abnormal" and "indicative of tendency to have focal seizures arising from the right frontal region, as evidenced by the sharp waves that were noted over that region and captured multiple nonepileptic events." [*Id.*] 500.

The ALJ dismissed this evidence primarily because plaintiff's boyfriend, who accompanied plaintiff during her admission to the EMU, "appear[ed] surprised when

---

[4] The Commissioner argues that the ALJ's handling off the off-task opinion is a moot point because the vocational expert testified that a claimant would be unable to work only if she were off-task for at least 13% of the workday, and here Serafini opined that plaintiff would off-task no more than 10% of the workday. *See* [19] 10-11. This argument ignores the possibility that, while the off-task limitation itself might not have precluded all employment, it could have affected plaintiff's ability to perform some or all of the jobs that the ALJ relied on at step five. Because of the ALJ's factual error, the Court has no basis to decide how the off-task limitation, if credited, might have affected plaintiff's RFC and the jobs she could (or could not) perform.

5

she mentioned" that she often stops speaking in the middle of a conversation and said that he "never noticed any staring spells or any moments of unresponsiveness." [14-1] 35 (citing [*id.*] 558). While the Court rejects plaintiff's contention that the ALJ could not consider the boyfriend's reaction without knowing more about the details of his relationship with plaintiff, *see* [17] 9, the Court cannot discern from the decision why the ALJ concluded that the boyfriend's reaction trumps the bottom-line conclusion that the EMU study was "abnormal" and indicated plaintiff's "tendency to have focal seizures." What's more, the doctors and nurses who supervised the EMU study personally observed plaintiff have at least one staring spell and one episode where her eyes rolled back in her head and she became unresponsive. *See* [*id.*] 499. If the boyfriend's reaction led the ALJ to conclude that plaintiff's claim to experience staring spells was incredible, the ALJ could not simply ignore evidence that medical professionals had witnessed plaintiff experience a staring spell and a period of non-responsiveness during the video-recorded EMU study. *See Joclyn D. on behalf of J.D.P. v. Kijakazi*, Case No. 3:20-cv-50213, 2022 WL 742438, at *8 (N.D. Ill. Mar. 11, 2022) ("The ALJ must confront evidence that does not support his conclusion and explain why it was rejected."). As plaintiff observes, moreover, the ALJ never mentioned any of the third-party seizure reports prepared by plaintiff's mother, sister, and cousin, each of whom stated that she had witnessed plaintiff experience multiple seizures. *See* [*id.*] 243-45, 275-77. Given the ALJ's reliance on the boyfriend's reaction to find that Dr. Serafini's opinion was unsupported, the family members' seizure reports cannot be dismissed as cumulative, as the Commissioner wrongly insists. *See* [19] 11-12. Finally, the ALJ also relied on evidence that some examinations during the EMU study noted that plaintiff "was alert and oriented, and retained normal cognitive function" [*id.*] 35-36, but this analysis is nonsensical, as noted above: the fact that plaintiff is alert and oriented while not experiencing a seizure or staring spell is not evidence that plaintiff can stay on-task during a seizure or staring spell. Thus, "[w]hat is missing" from the ALJ's decision "is a medical analysis confirming that the normal findings being cited were medically more significant than the contrary findings." *Sara N. v. Saul*, 2021 WL 4712711, at *3 (N.D. Ill. Jan. 11, 2021).

Third, the ALJ's determination that plaintiff had "good control of her symptoms" because, at the time of her August 2019 and January 2020 consultative exams, she was taking the same medication that was prescribed at the EMU study [14-1] 36, appears to be little more than the ALJ's hunch. Dr. Serafini never gave such an opinion, plaintiff reported in January 2020 that she continued to experience four to five seizures a week, *see* [*id.*] 994-95, and a January 2020 EEG again established the presence of "frequent sharp waves over the right frontal region consistent with an area of [ ]eplieptogenic [*sic*] potential[.]" [*Id.*] 991-92. In the absence of medical evidence supporting or consistent with the ALJ's hunch, this was not substantial evidence for rejecting Dr. Serafini's opinion

6

Finally, while it is unnecessary to reach these issues, the Court has significant concerns about the ALJ's apparent failure to include any work-related restrictions for plaintiff's epilepsy and seizures in the RFC, and his decision to include only environmental limitations for the severe headaches plaintiff experience. On remand, the ALJ should revisit the former issue after properly evaluating Dr. Serafini's opinion, and if the ALJ again imposes only environmental limitations for plaintiff's headaches, the ALJ should explain why no additional limitations are warranted. *Cf. Herrold v. Berryhill*, Cause No. 2:17-CV-68, 2018 WL 2979964, at *6 (N.D. Ind. June 14, 2018) (remanding where ALJ "has not created a logical bridge in her discussion of plaintiff's headaches to her conclusion that they are accommodated by hazards restrictions alone").

## Conclusion

Plaintiff's motion for summary judgment [17] is granted and defendant's motion for summary judgment [18] is denied. The decision of the Social Security Administration is reversed, and, in accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: December 9, 2024**